**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**TAMMY LALACK,**                                              3:11-CV-01285-BR

      **Plaintiff,**

                                         **OPINION AND ORDER**

**v.**                                                          **(REDACTED)**

**STATE OF OREGON, OREGON YOUTH**
**AUTHORITY, KENNETH JESKE, and**
**FARIBORZ PAKSERESHT,**

      **Defendants.**

**DANIEL J. SNYDER**
**CARL LEE POST**
**ERIN C. McCOOL**
Law Offices of Daniel Snyder
1000 S.W. Broadway
Suite 2400
Portland, OR 97205
(503) 241-3617

      Attorneys for Plaintiff

1 - REDACTED OPINION AND ORDER

**ELLEN F. ROSENBLUM**
Attorney General
**MARC ABRAMS**
**JESSICA L. McKIE**
Assistant Attorneys General
Oregon Department of Justice
1515 S.W. Fifth Avenue
Suite 410
Portland, OR 97201
(971) 673-1880

      Attorneys for Defendants


**BROWN, Judge.**

     This matter comes before the Court on Defendants' Motion
(#21) to Dismiss and/or for Summary Judgment and Plaintiff's
Motion (#80) for Leave to File Reply.  For the reasons that
follow, the Court **DENIES** Plaintiff's Motion for Leave and **GRANTS**
Defendants' Motion to Dismiss and/or for Summary Judgment.


<u>**BACKGROUND**</u>

     The following facts are viewed in the light most favorable
to Plaintiff and undisputed unless otherwise noted.

     Plaintiff Tammy Lalack began working as a part-time office
assistant at the Oregon Youth Authority's (OYA) Hillcrest
facility in March 1999 as part of an injured-workers program.[1]

     On October 1, 2000, Plaintiff began working as a full-time
Office Specialist 1 (OS1).

---

    [1] Plaintiff allegedly suffers from a number of cognitive and
mental-health problems.

2 - REDACTED OPINION AND ORDER

The record reflects Defendants noted professionalism issues with Plaintiff as early as 2003.  In a March 15, 2005, Written Reprimand by Hillcrest Support Services Coordinator Robert Skinner, which was signed by Plaintiff, Skinner noted the following chronology:[2]

**REDACTED**

Decl. of Marc Abrams, Ex. A at 121-22.  Skinner noted Plaintiff "continued to demonstrate deficient customer service skills and . . . continued to misuse the agency's e-mail system . . . [and] violated the confidentiality of a youth in [OYA] custody."  *Id*. at 122.  Specifically, Skinner noted:

**REDACTED**

*Id*. at 122-23.  Skinner directed Plaintiff to improve her customer-service skills immediately, to cease using OYA email for personal business, to limit access to JJIS to uses required by her job, and to adhere to OYA confidentiality requirements. Skinner advised Plaintiff that failure to do those things "may result in further discipline, up to and including, dismissal from state service."  *Id*. at 123.

---

[2] Skinner's reprimand noted numerous letters, conferences, and coaching sessions that had been held regarding Plaintiff's professionalism issues.

3 - REDACTED OPINION AND ORDER

At some point after June 6, 2006, Patricia Taylor replaced Robert Skinner as Plaintiff's supervisor.

On June 1, 2007, Taylor issued Plaintiff a Written Reprimand in which Taylor noted the following:[3]

**REDACTED**

Abrams Decl., Ex. A at 124-25.  Taylor noted management concluded at the end of the investigational interview that Plaintiff had engaged in unprofessional and inappropriate conduct on at least seven occasions between April 21, 2007, and May 14, 2007.  Taylor advised Plaintiff that her inappropriate and unprofessional conduct "will no longer be tolerated."  Taylor further advised Plaintiff that "any future incidences wherein [Plaintiff] . . . conduct[s] [herself] in an unprofessional manner, provide[s] deficient customer service, exercise[s] bad judgment, or offend[s] guests, visitors, youth or youth family members, or other staff, will result in further discipline, up to and including dismissal from state service."  *Id*. at 127.

On November 8, 2007, Taylor provided Plaintiff with her Performance Appraisal for the period October 2006 - October 2007. Taylor noted Plaintiff "accomplished the secretarial and support

---

[3] On June 1, 2007, Taylor issued Plaintiff a Written Reprimand in which Taylor noted that Plaintiff continued to struggle with professional behavior and inappropriate conduct.

4 - REDACTED OPINION AND ORDER

functions of her duties in a satisfactory manner," but the "accomplishment of her reception duties is not consistently satisfactory due primarily to [Plaintiff's] challenges in the area of getting along with others."  Abrams Decl., Ex. A at 128.

On December 20, 2007, Plaintiff met with a number of individuals including Taylor, Smith, and Service Employees International Union (SEIU) Representative Dan Murray to discuss the results of a neuropsychological evaluation of Plaintiff.  A number of suggestions were made to accommodate Plaintiff's various disabilities, and it was noted Plaintiff already had been removed from reception duties to accommodate her limitations.

On December 19, 2008, Plaintiff received a Letter of Warning with Expectations from Hillcrest Program Director Rick Hess related to a verbal altercation that Plaintiff had with a coworker.  Hess noted Plaintiff "used a loud, angry and accusatory tone of voice which was overheard by other coworkers in the vicinity."  Defs.' Court Requested Submission, Ex. 1 at 1. Hess directed Plaintiff not to be disrespectful to others in the workplace; to be responsible and accountable for her performance; to manage her behavior, comments, tone, and attitude; to foster positive and professional interactions with staff at all times; not to engage in "threatening postures"; and to exhibit good judgment "in determining how someone outside or inside the facility would view [her] actions."  *Id.* at 2.  Hess advised

Plaintiff that "further incidences of inappropriate and unprofessional conduct with others in the workplace may lead to disciplinary action." *Id.*

On April 13, 2009, Taylor provided Plaintiff with her Performance Appraisal for the period October 2007 – October 2008. Taylor noted Plaintiff's reception duties "were eliminated from her responsibilities, and her position was restructured to include primary job duties of photocopying, filing, processing mail, as well as other assigned work." Snyder Decl., Ex. 45 at 1. Taylor noted Plaintiff "takes her work seriously and wants it to be done well," Plaintiff "received thanks from the living unit Treatment Managers and Treatment Services Manager for her support," and Plaintiff showed initiative by tracking data on Youth Observation Logs. Taylor, however, noted Plaintiff needed to improve her ability to prioritize her workload, to "consistently maintain[] satisfactory performance, and [to] maintain[] harmonious working relationships." *Id.*

On July 21, 2009, Plaintiff received a Letter of Reprimand from Hillcrest Superintendent Troy Gregg in which he noted Plaintiff had a negative interaction with another OYA employee on May 11, 2009, in front of a youth's visiting family members in the lobby of the OYA Administration Building. The interaction was overheard by several staff members and resulted in "a negative interaction between [Plaintiff] and two coworkers which

created an unprofessional environment in front of a family of a youth." Snyder Decl., Ex. 48 at 2. Gregg advised Plaintiff that her behavior was "outside of the policy requirements addressed previously in your Letter of Warning with Expectations." Gregg advised Plaintiff that "failure to correct [her] behavior and/or any recurrence of the same or similar misconduct with coworkers and in front of families of youth offenders may subject [her] to more severe disciplinary action up to and including dismissal from state service." *Id*.

On October 21, 2009, Plaintiff received a one-step salary reduction for two months. OYA Human Resources Manager Belinda Teague described the "charges causing [that] action" as follows:[4]

**REDACTED**

Abrams Decl., Ex. A at 132. Teague noted ten specific instances in August and September 2009 of Plaintiff failing to stay on task with the duties of her job, interjecting herself into the work of other employees, or looking for things to criticize her coworkers. Teague concluded:[5]

---

[4] OYA Human Resources Manager Belinda Teague attributed the discipline to co-workers having complained that Plaintiff's behavior created an intimidating and hostile environment for them.

[5] OYA found Plaintiff's behavior to violate OYA policies and professional standards. Plaintiff was informed recurrence could lead to further discipline, including dismissal.

**REDACTED**

Abrams Decl., Ex. A at 137.

On December 3, 2009, Plaintiff met with OYA Professional Standards Office (PSO) Manager Kenneth Jeske, Facilities Director Joan Palmateer, and SEIU Vice President Joe King to discuss Plaintiff's possible transfer from Hillcrest to the PSO. At that meeting Plaintiff reiterated she suffers from a number of physical and mental-health issues.

Plaintiff testifies in her Declaration that at some point between December 15 and December 21, 2009, she sent an email[6] to Gregg in which she advised him that she "had witnessed [OYA] Group Life Coordinator 2 Deborah VanCamp, using hostile intimidation tactics towards a youth until the youth reacted and acted out, causing the youth to be taken to the 'Quiet Room.'" Lalack Decl. at ¶ 112.

On December 21, 2012, Plaintiff transferred to the PSO as an Office Specialist I.

On January 7, 2010, Jeske allowed Plaintiff to have flex time to arrive at 9:00 a.m. instead of 8:00 a.m. and to end at 5:30 p.m. rather than 5:00 p.m. to accommodate her various health issues. Plaintiff testified at deposition that she was aware the flex time meant only that her start and ending times were

---

[6] This email is not in the record.

different from other employees and did not mean she could vary her arrival and departure times from the designated hours of 9:00 a.m. to 5:30 p.m.

Plaintiff was on leave on various days in January 2010 under the Family Medical Leave Act (FMLA). Specifically, Plaintiff was out from January 19, 2010, through February 1, 2010, on FMLA leave for surgery. Plaintiff was also off from work on sick or medical leave on other days in February and March 2010.

On April 14, 2010, Taylor provided Plaintiff with her Performance Appraisal for the period October 1, 2008, through December 21, 2009. Taylor rated Plaintiff as "Meets Expectations" in knowledge and application of principles, techniques, procedures, and requirements specific to her position and in the care and maintenance of state resources, tools, materials, and equipment. Taylor rated Plaintiff as "Needs Improvement" in nine other areas including work efficiency and productivity, effective use of time, attendance, and compliance with agency procedures and policies. Plaintiff received "Unsatisfactory" in two categories: (1) ability to work "in harmony" with coworkers, managers, program customers, and stakeholders and (2) compliance with state and agency policies and procedures. Taylor rated Plaintiff's overall performance as "Needs Improvement."

On April 22, 2010, Jeske sent Plaintiff an email in which he

noted Plaintiff had been "chatting" on the telephone for over 20 minutes on nonwork-related issues and requested Plaintiff to remain focused on work.  Jeske advised he would have told Plaintiff in person, but Plaintiff's "niece is in there and it would be rude."  Snyder Decl., Ex. 65.

On April 30, 2010, and May 4, 2010, Jeske emailed Plaintiff regarding Plaintiff's failure to arrive on time to work on April 30, 2010, despite being allowed to start at 9:00 a.m.

On May 6, 2010, Plaintiff complained to OYA Director Fariborz Pakseresht about the way Jeske treated her.

On May 7, 2010, Plaintiff emailed Pakseresht and complained Jeske had employee Annette Hilton enter child-abuse reports and time herself "on how many . . . she could do."  Plaintiff stated Jeske then advised Plaintiff that he expected her to do the same number of reports.  Plaintiff asserted she did not believe Jeske was fair because Annette "knows the programs, forms and administers this program" and Hilton "is an executive support" whereas Plaintiff is an "OS1."  Snyder Decl., Ex. 69 at 1.  On May 7, 2010, Pakseresht responded via email and advised Plaintiff to schedule time with Jeske to discuss her concerns.  Pakseresht advised Plaintiff that she could also have her union representative present for that conversation if she wished to do so.

On May 13, 2010, Jeske advised Plaintiff that she was not

meeting his expectations and that he wanted her to attend a
meeting on May 14, 2010, to address her performance issues.

Also on May 13, 2010, Plaintiff emailed Pakseresht and
advised him that she had been told she had "a meeting/
investigation[] tomorrow and it's about how I'm not meeting
[Jeske's] expectations in my job duties and about an issue that
occurred with Kelly."  Snyder Decl., Ex. 69 at 2.  Pakseresht
responded that same day as follows:

> This is a difficult situation for everyone,
> especially you.  We need to determine if you can
> be successful doing this type of work.  Everyone
> is focused on helping you and no one I know of has
> any intent to push you out or stand in the way of
> your success.  Meanwhile PSO work has to get done
> considering the backlog of the service they
> provide.

*Id*.  On May 13, 2010, Plaintiff emailed Pakseresht again to "let
[him] know that I think the relationship between [Jeske] and
[Hilton] is inappropriate[.  A]n example is the other day we were
in a meeting and [Hilton] made a comment 'I wouldn't change a
thing about you Mr. Jeske' other times its [*sic*] 'your [*sic*] so
awesome Mr. Jeske' she is always talking to him that way, it
makes me feel uncomfortable."  Snyder Decl., Ex. 72 at 1.
Pakseresht thanked Plaintiff for "sharing [her] perspective" and
stated he believed they needed to address each individual issue
separately.  Pakseresht then set out the issues as he understood
them, including (1) Plaintiff's ability to complete assigned work
in a timely and correct manner, (2) Plaintiff's concerns about

11 - REDACTED OPINION AND ORDER

the work environment related to comments by Hilton and "fair treatment by your manager and team members," and (3) Plaintiff's concerns about being accommodated.

On May 14, 2010, Jeske and Human Resources Analyst Vicky Chartier met with Plaintiff and advised her that she was submitting work that contained errors, was frequently tardy, was making personal telephone calls during work, and was being disruptive in the workplace.  Plaintiff was represented at the meeting by SEIU Stewards Cliff Hassel and Lorna Huston. Plaintiff was off from work on FMLA leave on Friday, May 14, 2010, after the meeting with Jeske.

On May 19, 2010, Plaintiff reported to Jeske that she believed OYA Investigator Kelly Wahl had breached confidentiality by speaking with another employee (Lori Ramsay) about a pending investigation of Ramsay's husband, who also worked for OYA.

Near the end of June 2010 Plaintiff met with Jeske and advised him that several female staff members were maintaining contact with former youth offenders on Facebook and that another employee, Nick Pearce, had posted a photo of himself and a subordinate OYA employee on his Facebook page, all of which Plaintiff believed was inappropriate.  Jeske directed Plaintiff to print the Facebook pages at issue, and Jeske then gave them to Senior Human Resources Analyst Kerry Haverty for investigation.

Plaintiff testifies in her Declaration that at some point in

12 - REDACTED OPINION AND ORDER

June 2010 she reported to Gregg that she saw "OYA staff playing dodgeball in a way that might injure the youth offenders because it was so rough.  I also saw an OYA staff playing dodgeball who was not yet trained on how to interact with youth offenders.  I was worried about the safety of the youth so I made my report." Lalack Decl. at ¶ 170.

On July 1, 2010, Haverty advised Plaintiff by letter that OYA had completed an investigation of her report about employees' contact with former youth offenders via Facebook, had "taken appropriate action which we believe will address your concerns and prevent similar actions from taking place in the future," and considered the matter closed.  At that time, Haverty advised Plaintiff that her report related to dodgeball was unsub-stantiated, and the matter was closed.

On July 19, 2010, Pakseresht placed Plaintiff on "duty station at home" status and issued a predismissal letter in which he noted Plaintiff's performance appraisals in November 2007, April 2009, and April 2010 included concerns about Plaintiff's performance in the workplace, particularly in the areas of staying on task, professionalism, and "contribution towards a harmonious workplace."  Snyder Decl., Ex. 78 at 2.  Pakseresht reviewed the past Letters of Warning and Reprimand issued in December 2008 and July 2009 as well as Plaintiff's reduction in

pay in November 2009.  Pakseresht noted:[7]

**REDACTED**

Snyder Decl., Ex. 78 at 3-4.  Pakseresht then addressed the
"charges and facts supporting" the predismissal action,
including:[8]

**REDACTED**

*Id.*  Pakseresht advised Plaintiff that she had the right to
appear at a predismissal meeting on July 28, 2010, and/or to
provide a written statement and to be represented by the SEIU at
the meeting.

On July 23, 2010, Plaintiff provided a written statement in
response to the predismissal letter.  Plaintiff asserted the
dismissal was "pretext for discrimination and retaliatory animus"
on the basis of her disabilities and/or for exercise of her
rights under worker's compensation and/or for exercise of her
rights under FMLA.  Plaintiff also asserted in response to the
factual allegations that she felt she was not properly trained,

---

[7] Pakseresht noted steps that PSO Manager Jeske had taken to
aid Plaintiff in succeeding at her new position.

[8] Pakseresht then addressed the "charges and facts
supporting" the presdismissal action.  The specifics of the
charges can be found in the record on the Motion for Summary
Judgment, Snyder Decl., Ex. 78 at 3-4.

that she believed a "proper" investigation had not taken place, and that Jeske's expectations were too high.

On July 27, 2010, Jeske was advised of the presence of a July 14, 2010, photograph that Plaintiff posted to her Facebook account during work hours showing Plaintiff's legs on her desk at OYA together with an OYA AIM report, which is a confidential agency document.  Jeske contacted Plaintiff and directed her to remove the picture immediately.

On July 28, 2010, Assistant Human Resources Manager Glenn Smith conducted a predismissal hearing with Plaintiff, Jeske, Chartier, and Plaintiff's daughter.  Plaintiff was represented at the meeting by SEIU Steward Deborah Shook.  Plaintiff testified at deposition that both she and Shook had opportunities to talk and to present her defense at the hearing.

On August 23, 2010, Haverty sent Plaintiff a letter noting Plaintiff had removed confidential documents from the workplace without authorization and directing Plaintiff to return them.

On August 23, 2010, Pakseresht sent Plaintiff a Commencement of Pre-dismissal Proceedings Letter in which he reviewed Plaintiff's disciplinary history and set out the charges and facts supporting the action.  The letter contained all of the charges and facts set out in the July 19, 2010, letter together with additional information and conclusions, including, among other things, the following:  (1) Plaintiff investigates

information even though she has been specifically instructed not
to do so and it

> affects the reliability of information in the
> system and on PSO reports.

> **REDACTED**

(2) Plaintiff's 50-minute conversation on April 9, 2010,
constitutes, among other things, a failure

> to be a responsible steward of the publics [*sic*]
> trust

> **REDACTED**[9]

(3) Plaintiff's interactions with a coworker and IT on April 22,
2010, "show repeated workplace behavior of responding in an
untruthful manner when questioned about your work activities."
(4) Plaintiff's failure to complete a daily performance log from
April 13-16, 2010, "show[s] your inability or unwillingness to
stay focused, follow your supervisor's instructions and your
failure to utilize the appropriate resources available to you.
You once again were untruthful when responding to questions about
your activities in the workplace."  Snyder Decl., Ex. 81 at 5-8.

In the August 23, 2010, letter Pakseresht also included the
following issues regarding Plaintiff's performance:[10]

---

[9] The specifics of the charges can be found in the record on
the Motion for Summary Judgment, Snyder Decl., Ex. 81.

[10] In the August 23, 2010, letter, Pakseresht also included
issues regarding Plaintiff's performance.  The specifics of
Plaintiff's performance issues can be found in the record on the

16 - REDACTED OPINION AND ORDER

**REDACTED**

Snyder Decl., Ex. 81 at 8-10.  Pakseresht advised Plaintiff that a predismissal meeting would be held on August 31, 2010; that Plaintiff could provide a written statement; and that Plaintiff was entitled to be represented by the SEIU.

On August 24, 2010, Pakseresht sent Plaintiff a letter advising her that OYA was rescinding the July 19, 2010, Predismissal Letter and issuing the August 23, 2010, Predismissal Letter.  Plaintiff prepared and submitted a written response to the August 23, 2010, Predismissal Letter.

On August 31, 2010, Smith conducted a second pre-dismissal meeting with Plaintiff, Jeske, and Haverty.  Plaintiff was represented by SEIU Steward Shook.

On September 2, 2010, Plaintiff sent a letter to Pakseresht in which she asserted that she believed she was being subjected to discrimination and retaliation by OYA on the basis of her disabilities and/or for her filing of a worker's compensation claim and/or for taking medical leave.

On September 10, 2010, Pakseresht sent Plaintiff a Dismissal from State Service Letter terminating her employment.  Pakseresht again reviewed Plaintiff's performance and disciplinary history and included all of the issues as set out in the July 19, 2010,

---

Motion for Summary Judgment, Snyder Decl., Ex. 81.

17 - REDACTED OPINION AND ORDER

and August 23, 2010, letters.  Pakseresht noted Plaintiff's
responses to the issues set out in the letters, and Pakseresht
responded that, among other things, (1) it was not unreasonable
for OYA to expect Plaintiff to arrive at work on time and to
limit her personal phone calls and other nonbusiness-related
activities to her two break periods and lunch; (2) OYA had worked
to accommodate Plaintiff's disabilities as shown by the
adjustments made to Plaintiff's schedule and to her work station
at Hillcrest and PSO; (3) Jeske had implemented a training
process for Plaintiff that included a number of different
components such as monthly meetings that included SEIU
representatives, coworker-assisted training on AIM, daily logging
activity, and additional help available from a number of
different employees; and (4) Plaintiff misrepresented the truth
in her complaints against coworkers, which wasted agency
resources on investigation.  Pakseresht concluded:[11]


**REDACTED**


Abrams Decl., Ex. A at 178.  Pakseresht advised Plaintiff that
she could appeal the action within 30 days and could be
represented in an appeal by SEIU.

_____

        [11] This letter is found in its complete form in the record
on the Motion for Summary Judgment at Abrams Decl., Ex. A at 169-
78.

On October 25, 2011, Plaintiff filed an action in this Court against the State of Oregon, OYA, Jeske, and Pakseresht in which Plaintiff alleged ten claims:  (1) violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, against the State; (2) violation of the Oregon Rehabilitation Act, Oregon Revised Statute § 659A.100, *et seq.,* against the State; (3) violation of FMLA, 29 U.S.C. § 2601, against the State; (4) violation of the Oregon Family Leave Act (OFLA), Oregon Revised Statute § 659A.150, against the State; (5) violation of Oregon's whistleblower statute, Oregon Revised Statute § 659A.203, against the State; (6) violation of Oregon's whistleblower statute, Oregon Revised Statute § 659A.199, against the State; (7) violation of Plaintiff's right to substantive due process pursuant to 42 U.S.C. § 1983 against all Defendants; (8) violation of Plaintiff's right to procedural due process pursuant to 42 U.S.C. § 1983 against all Defendants; (9) violation of Oregon's injured-worker discrimination statute, Oregon Revised Statute § 659A.040, against the State; and (10) wrongful termination by the State.

On July 25, 2012, Defendants filed a Motion to Dismiss and/or for Summary Judgment as to all of Plaintiff's claims in which they asserted, among other things, that Plaintiff's Second, Fourth, Fifth, Sixth, Ninth, and Tenth Claims may not be brought in this Court due to sovereign immunity and the conduct of

19 - REDACTED OPINION AND ORDER

Defendants prior to October 25, 2009, may not form the basis of any of Plaintiff's claims because of the applicable statutes of limitations.

Although Plaintiff did not address in her responsive papers Defendants' assertion that their conduct before October 25, 2009, could not form the basis of Plaintiff's claims, Plaintiff appeared to concede Defendants' statute-of-limitations argument. In addition, Plaintiff stipulated in her Response that (1) dismissal of her First Claim was appropriate because of sovereign immunity; (2) dismissal of her Seventh and Eighth Claims as to the State was appropriate; and (3) the Court should dismiss without prejudice Plaintiff's Second, Fourth, Fifth, Sixth, Ninth, and Tenth Claims.

On October 11, 2012, the Court entered an Order in which it (1) concluded Defendants' conduct prior to October 25, 2009, may not form the basis for any of Plaintiff's claims; (2) dismissed with prejudice Plaintiff's First Claim and Plaintiff's Seventh and Eighth Claims as to the State; and (3) dismissed without prejudice Plaintiff's Second, Fourth, Fifth, Sixth, Ninth, and Tenth Claims. As to the remaining claims (violation of FMLA against the State and substantive and procedural due-process claims against the individual Defendants), the Court noted the voluminous briefing materials submitted by the parties contained numerous references to facts and theories of law that were no

longer at issue, and it was difficult to sift through the
parties' various arguments and evidence in an attempt to identify
and to isolate the factual materials and legal arguments that
pertain solely to the remaining claims.  Accordingly, the Court
directed Plaintiff to file a supplemental memorandum identifying
the disputed facts that are material to Plaintiff's remaining
claims and summarizing the legal bases on which Plaintiff relies
to oppose Defendants' Motion as to those claims.  The Court also
directed Defendants to file a response to Plaintiff's
supplemental memorandum.

On October 23, 2012, Plaintiff filed a Supplemental
Memorandum in Opposition to Defendants' Motion.  On October 29,
2012, Defendants filed a Supplemental Memorandum in Support of
their Motion in which Defendants asserted for the first time that
Plaintiff's FMLA claim is barred by sovereign immunity as set out
in *Coleman v. Court of Appeals of Maryland*, 132 S. Ct. 1327
(2012).

On December 18, 2012, the Court heard oral argument on
Defendants' Motion to Dismiss and/or for Summary Judgment as to
Plaintiff's remaining claims, directed the parties to provide the
Court with certain documents referenced in the materials that
were not contained in the record, directed Plaintiff to file a
second supplemental memorandum, and directed Defendants to file a
response to Plaintiff's second supplemental memorandum.  The

21 - REDACTED OPINION AND ORDER

Court took this matter under advisement on January 18, 2013.

On January 25, 2013, Plaintiff filed a Motion (#80) for Leave to File Reply in which she seeks leave to file a Reply to address the policies that Defendants attached to their Response to Plaintiff's second supplemental memorandum.  As Defendants note in their Response to Plaintiff's Motion, however, Defendants provided Plaintiff with a URL to all of Defendants' policies during discovery, and, in fact, Plaintiff relied on some of these policies in her second supplemental memorandum.  In addition, this matter has already been thoroughly briefed.  Accordingly, the Court denies Plaintiff's Motion (#80) for Leave to File Reply.

## STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011)*. See also* Fed. R. Civ. P. 56(a).  The moving party must show the absence of a genuine dispute as to a material fact. *Emeldi v. Univ. of Or.*, 673 F.3d 1218, 1223 (9th Cir. 2012).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and point to "specific facts demonstrating the existence of genuine issues for trial." *In re*

22 - REDACTED OPINION AND ORDER

*Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)
"This burden is not a light one. . . .  The non-moving party must
do more than show there is some 'metaphysical doubt' as to the
material facts at issue." *Id.* (citation omitted).

A dispute as to a material fact is genuine "if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d
1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all
reasonable inferences in favor of the nonmoving party.  *Sluimer
v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).  "Summary
judgment cannot be granted where contrary inferences may be drawn
from the evidence as to material issues." *Easter v. Am. W. Fin.*,
381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts
Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598
(9th Cir. 1982)).

"A non-movant's bald assertions or a mere scintilla of
evidence in his favor are both insufficient to withstand summary
judgment." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir.
2009)(citation omitted).  When the nonmoving party's claims are
factually implausible, that party must "come forward with more
persuasive evidence than otherwise would be necessary." *LVRC
Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)
(citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149

(9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id*.


### DISCUSSION

As noted, Plaintiff's only remaining claims in this matter are for violation of FMLA against the State and violation of Plaintiff's rights to substantive and procedural due process against the individual Defendants.

**I.    FMLA**

Defendants assert Plaintiff's claim for violation of FMLA against the State must be dismissed because in March 2012 the United States Supreme Court decided in *Coleman* that states are immune from FMLA claims that arise under 29 U.S.C. § 2612(1)(D).

Although Plaintiff concedes *Coleman* made clear that her type of FMLA claim is generally barred by sovereign immunity, she contends the State waived its immunity because it did not assert sovereign immunity as a defense until it filed its Supplemental Memorandum in October 2012, which was seven months after the Supreme Court's decision in *Coleman*.

**A.    Standard**

Under the Eleventh Amendment the sovereign is immune to claims against it by its citizens.  U.S. Const. amend XI.  *See also Tennessee v. Lane*, 541 U.S. 509, 517 (2004).  Congress, however, may abrogate a state's sovereign immunity under certain circumstances, or, as with other constitutional rights, a state may voluntarily waive its right to immunity.  *See Lane v. Pena*, 518 U.S. 187, 192-98 (1996).

The test for waiver of sovereign immunity is a "stringent one."  *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675-78 (1999)(quotation omitted).  Sovereign immunity may not be impliedly or constructively waived, and courts must "indulge every reasonable presumption against waiver."  *Id*. at 678-82 (waivers of sovereign immunity must be "unmistakably clear").  Any ambiguity in the waiver of sovereign immunity must be construed in favor of immunity.  *United States v. Nordic Village, Inc*., 503 U.S. 30, 34 (1992).

**B.  Analysis**

*Coleman* had not been decided at the time that Plaintiff filed this action.  Attorney Marc Abrams testifies in his Declaration that neither he nor other Department of Justice attorneys were aware of *Coleman* until October 18, 2012, and, as a result, the State failed to rely on *Coleman* in its initial briefing.  Abrams testifies he telephoned Plaintiff's counsel

within an hour of finding *Coleman* to advise him that the State
was going to rely on *Coleman*.  Plaintiff was provided with the
opportunity to address the *Coleman* case in her Supplemental
Memorandum filed October 23, 2012, and at oral argument.

At oral argument Plaintiff asserted all attorneys in
the Oregon Department of Justice practicing employment law should
have been aware of the *Coleman* case prior to July 2012 when
Defendants filed their materials in support of their Motion.  The
Court, however, concludes defense counsel's failure to be aware
of *Coleman* for seven months does not constitute an "unmistakably
clear" waiver of sovereign immunity, particularly in light of the
fact that the Supreme Court has advised courts that they must
"indulge every reasonable presumption against waiver."

In addition, the cases relied on by Plaintiff to
support her waiver argument are distinguishable from this matter.
For example, in *Hill v. Blind Industries and Services of Maryland*
the defendant did not assert immunity until the first day of
trial even though it had filed two prior motions to dismiss.  179
F.3d 754, 756 (9th Cir. 1999)("Hill contends that BISM waived any
Eleventh Amendment immunity it might possess by participating in
extensive pre-trial activities and waiting until the first day of
trial before objecting to the federal court's jurisdiction on
Eleventh Amendment grounds.  We agree.").  In *Lapides v. Board of
Regents of University System of Georgia* the Supreme Court

26 - REDACTED OPINION AND ORDER

concluded the defendant waived sovereign immunity when the
defendant removed the matter to federal court.  535 U.S. 613, 620
(2002)("[T]he State was brought involuntarily into the case as a
defendant in the original state-court proceedings.  But the State
then voluntarily agreed to remove the case to federal court
. . . .  In doing so, it voluntarily invoked the federal court's
jurisdiction.").  In *In re Bliemeister* the State answered the
debtor's properly filed complaint, but the State did not raise an
immunity defense at that time nor when it filed its motion for
summary judgment.  296 F.3d 858, 861 (9th Cir. 2002).  The State
attended the bankruptcy court's oral hearing on May 31, 2000, and
argued the merits of the case.  The State heard the bankruptcy
court announce its preliminary leanings, which were initially
unfavorable to the State, and requested supplemental briefing on
what constitutes a "transaction."  The State still did not assert
sovereign immunity until it filed a motion to dismiss in
conjunction with the requested supplemental briefing.  *Id*. at
862.  The Ninth Circuit concluded the state had waived sovereign
immunity:

> [T]he State's delay in asserting immunity was
> clearly a tactical decision.  Finding waiver is
> appropriate here because the State benefitted from
> hearing the bankruptcy court's leanings.  To allow
> a state to assert sovereign immunity after
> listening to a court's substantive comments on the
> merits of a case would give the state an unfair
> advantage when litigating suits.

*Id*.

27 - REDACTED OPINION AND ORDER

Here, however, there is not any indication of gamesmanship by the State or any attempt to gain a litigation advantage. On this record the Court does not find the necessary unmistakable waiver of sovereign immunity as to Plaintiff's FMLA claim. Accordingly, the Court concludes *Coleman* applies and grants Defendants' Motion to Dismiss and/or for Summary Judgment as to Plaintiff's FMLA claim and dismisses that claim with prejudice.

## II.  Substantive Due Process

### A.  Factual bases for Plaintiff's claim against Jeske and Pakseresht for violation of Plaintiff's right to substantive due process

In her Complaint Plaintiff alleges the following:

> Defendants, while acting under color of state law, violated Plaintiff's rights to free speech, as guaranteed by the First Amendment to the United States Constitution, by retaliating against Plaintiff because she complained of violation of state law, federal law, and agency policy.

> Plaintiff's speech was a matter of public concern.

Compl. ¶¶ 132-33.

Plaintiff also identified numerous reports made by her to various individuals as bases for her claim.

On October 11, 2012, the Court entered an Order in which it directed Plaintiff to file a Supplemental Memoranda identifying the disputed facts that are material to her substantive due-process claim against Jeske and Pakseresht and summarizing the legal bases on which Plaintiff relies to oppose Defendants' Motion as to that claim.  In her Supplemental Memorandum Plaintiff relied on her report of the alleged breach of confidentiality involving Ramsay and noted even though she addressed only that one report, she "does not concede that the other three reports referenced in her initial memorandum are not matters of public concern."  Because it was still unclear to the Court which particular reports Plaintiff was relying on to support her substantive due-process claim, the Court directed

29 - REDACTED OPINION AND ORDER

Plaintiff to file a second supplemental brief identifying "each act of speech that . . . [P]laintiff is moving on."

On January 4, 2013, Plaintiff filed a second supplemental memorandum in which she identified the following "four acts of speech" on which she bases her claim against Jeske and Pakseresht:

> (1) OYA staff throwing basketballs and volleyballs so hard at youth offenders that Plaintiff feared for their physical safety

> (2) Sexual conduct between OYA staff at a state-sponsored training event as documented by photo on Facebook

> (3) Improper relationships between OYA staff and youth offenders or former youth offenders

> (4) Potential breach of confidentiality in an investigation involving youth offender

Although Plaintiff's third act of speech remains vague, it appears from Plaintiff's Opposition, Supplemental Memoranda, and other filings that Plaintiff relies on the following "acts of speech" as bases for her First-Amendment claim:

> (1) Plaintiff's June 2010 report that OYA employees were playing dodgeball with youth in a manner that Plaintiff believed was too aggressive;

> (2) Plaintiff's June 2010 report that Pearce had posted a photo of himself and a subordinate OYA employee on his Facebook page;

30 - REDACTED OPINION AND ORDER

(3)  Plaintiff's June 2010 report that several
     female staff members were maintaining contact
     with former youth offenders on Facebook; and

(4)  Plaintiff's May 19, 2010, report that Wahl
     had breached confidentiality by speaking with
     Ramsay about a pending investigation of
     Ramsay's husband.

**B.    Nature of Plaintiff's substantive due-process claim**

At oral argument Plaintiff made clear that her
substantive due-process claim related only to the alleged
retaliation by Defendants Jeske and Pakseresht against Plaintiff
for exercising her First-Amendment right to free speech.  At oral
argument, however, the Court pointed out that infringement of the
right to free speech cannot provide the basis for a violation of
substantive due process.  Specifically, the Supreme Court has
held when a "particular amendment 'provides an explicit textual
source of constitutional protection' against a particular sort of
government behavior, 'that Amendment, not the more generalized
notion of "substantive due process," must be the guide for
analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273
(1994)(quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).
Because the First Amendment provides explicit protection for the
right to free speech, Plaintiff may not base a substantive due-
process claim on a violation of her right to free speech.

Plaintiff's substantive due-process claim, therefore, is properly analyzed as one for violation of her right to free speech under the First Amendment. *See, e.g.*, *Denney v. Drug Enforcement Admin.*, 508 F. Supp. 2d 815, 834-35 (E.D. Cal. 2007). Accordingly, the Court analyzes Plaintiff's substantive due-process claim as a claim for violation of her right to free speech under the First Amendment.

### C.    Standards

To determine whether a government employer has violated a public employee's First-Amendment right to free speech, the court must engage in a five-step inquiry:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011)(citing *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)). "Notably, 'because these are sequential steps,' a plaintiff's failure to satisfy a single one 'necessarily concludes our inquiry.'" *Id.* at 961-62 (quoting *Huppert v. City of Pittsburgh*, 574 F.3d 696, 703 (9th Cir. 2009)).

### D.    Defendant Pakseresht

The Ninth Circuit has made clear that supervisors may

not be held liable under § 1983 "'merely for being present at the scene of an alleged unlawful act' or for being a member of the same team as the wrongdoers." *Maxwell v. County of San Diego*, 697 F.3d 941, 962 (9th Cir. 2012)(quoting *Jones v. Williams*, 297 F.3d 930, 936-38 (9th Cir. 2002)).  "*Ashcroft v. Iqbal*, . . . clarified that there is no *respondeat superior* liability under § 1983.  Rather, a government official may be held liable only for the official's own conduct.  *Id*. at 675-76, 129 S. Ct. 1937." *Id*.

Defendants assert Pakseresht is entitled to summary judgment as to Plaintiff's First-Amendment claim because Plaintiff fails to allege any actions taken by Pakseresht that violated Plaintiff's First-Amendment rights.  In fact, Plaintiff testified at deposition that Pakseresht never did anything improper; "he just didn't do anything about it."  In addition, it is undisputed that Pakseresht was not Plaintiff's direct supervisor, that he did not have any personal knowledge of the facts supporting Plaintiff's termination, and that he left investigation and conclusions related to Plaintiff's work to Human Resources and relied on their investigation and conclusions.  Although Pakseresht signed Plaintiff's termination letter, he did so solely in his capacity as OYA Director, who is the second in charge of between 3,000 and 4,000 employees.  As noted, "there is no *respondeat superior* liability under

§ 1983." *Maxwell*, 697 F.3d at 675.

Plaintiff did not respond to Defendants' *respondeat superior* argument in her Supplemental Memorandum or at oral argument.

On this record the Court concludes Plaintiff has not established any issue of material fact as to whether Pakseresht engaged in conduct that violated Plaintiff's First-Amendment rights. Accordingly, the Court grants Defendants' Motion as to Plaintiff's First-Amendment claim against Pakseresht.

**E.    Defendant Jensen**

Defendants contend the four reports that form the basis of Plaintiff's First-Amendment claim did not constitute speech on matters of public concern, Plaintiff has not established her speech was a substantial motivating factor in her termination, Defendants would have taken the same action even in the absence of Plaintiff's protected speech, and Plaintiff reported these events pursuant to her job duties rather than as a private citizen. According to Defendants, therefore, Plaintiff has not made out a jury question as to whether she was exercising her First-Amendment rights when she made these reports or whether Defendants terminated her in retaliation for exercising her First-Amendment rights.

**1.    Matters of public concern**

Whether speech "touche[s] upon a matter of public

concern" is a question of law not fact.  *Johnson*, 658 F.3d at 964
(quotation omitted).  The "aim . . . is . . . to determine
whether the content of the employee's speech is sufficiently
important to the public that its curtailment warrants judicial
review."  *Id.* (quotation omitted).

> Under that analysis, we consider generally the
> content, form, and context of a given statement,
> as revealed by the whole record, to ascertain
> whether speech fairly can be said to relate to any
> matter of political, social, or other concern to
> the community.
>
> Of the three concerns, content is king.  It is the
> greatest single factor . . . and our primary
> concern.  Form and context only truly inform our
> legal inquiry in those "close" cases where the
> subject matter of a statement is only marginally
> related to issues of public concern.  In those
> cases, the fact that [a statement] was made
> because of a grudge or other private interest or
> to co-workers rather than to the press may lead
> the court to conclude that the statement does not
> substantially involve a matter of public concern.

*Id.* at 964-65 (quotations omitted).

If Plaintiff's speech "cannot be fairly
characterized as constituting speech on a matter of public
concern," there is not any First-Amendment violation regardless
of the reason for her discharge.  *Connick v. Myers*, 461 U.S. 138,
147 (1983).  *See also Desrochers v. City of San Bernardino*, 572
F.3d 703, 710 n.4 (9th Cir. 2009)(same).

> To address a matter of public concern, the content
> of the . . . speech must involve "issues about
> which information is needed or appropriate to
> enable the members of society to make informed
> decisions about the operation of their

> government." *McKinley*, 705 F.2d at 1114 (internal
> quotation marks and citation omitted); *see also*
> *Gillette v. Delmore*, 886 F.2d 1194, 1197 (9ᵗʰ Cir.
> 1989)(describing "matter[s] of political, social,
> or other concern to the community" as matters of
> public concern).  "On the other hand, speech that
> deals with 'individual personnel disputes and
> grievances' and that would be of 'no relevance to
> the public's evaluation of the performance of
> governmental agencies' is generally not of 'public
> concern.'"  *See Coszalter v. City of Salem*, 320
> F.3d 968, 973 (9ᵗʰ Cir. 2003)(quoting *McKinley*,
> 705 F.2d at 1114); *see also Connick*, 461 U.S. at
> 154, 103 S. Ct. 1684 (stating that speech limited
> to "an employee grievance concerning internal
> office policy" is unprotected).  The same is true
> of "speech that relates to internal power
> struggles within the workplace," and speech which
> is of no interest "beyond the employee's
> bureaucratic niche."  *Tucker v. Cal. Dep't of
> Educ.*, 97 F.3d 1204, 1210 (9ᵗʰ Cir. 1996)
> (internal quotation marks and citation omitted).

*Desrochers,* 572 F.3d at 710.  The Ninth Circuit has

> never held that a simple reference to government
> functioning automatically qualifies as speech on a
> matter of public concern.  To the contrary, as we
> have recently indicated, the fact that speech
> contains 'passing references to public safety[,]
> incidental to the message conveyed' weighs against
> a finding of public concern.

*Id*. at 711.

In *Desrochers* the Ninth Circuit noted "the reality

that poor interpersonal relationships amongst coworkers might

hamper the work of a government office does not automatically

transform speech on such issues into speech on a matter of public

concern."  *Id*.  In particular, "[t]here is a significant

distinction between complaints of a poor working relationship

with one's superior and complaints involving on-the-job

36 - REDACTED OPINION AND ORDER

consumption of alcohol, anti-Semitism, use of excessive force, discrimination, and allegations of racial and gender bias." *Id.* at n.7. "[T]he *content* of the communication must be of broader societal concern. [Our] focus must be upon whether the public or community is likely to be *truly interested* in the particular expression, or whether it is more properly viewed as essentially a private grievance." *Id.* (quotation omitted)(emphasis in original).

Applying these standards, the Court concludes Plaintiff has not established as a matter of law that her report related to dodgeball is speech on a matter of public concern. Plaintiff testified in her deposition that she believed staff members may have been playing dodgeball too hard with some youths in the OYA because the balls thrown by the staffers "would hit the wall and bounce back to staff." Abrams Decl., Ex. A at 53. Plaintiff noted staff is not supposed to have any contact sports with the youth, "and, to [Plaintiff], a ball leaving our hands and contacting with the youth, possibly injuring them, would be a contact sport." *Id.* The nature of a dodgeball game with OYA youth is a matter involving OYA internal policy and whether the policy was violated by the dodgeball game. Thus, the nature of the act is distinct from acts such as consumption of alcohol on the job, anti-Semitism, or racial or gender bias. The Court concludes the incident of the dodgeball game is not the kind of

issue that the public is likely to be "truly interested" in and, therefore, cannot be fairly characterized as constituting speech on a matter of public concern.

The Court also concludes Plaintiff's reports regarding the Facebook incidents are not matters of public concern. As noted, Plaintiff testified she reported the fact that unnamed staff members were communicating with former youth offenders on Facebook and that OYA internal regulations prohibit contact by staff with former offenders via social media. Staff-member contact with former youth offenders, however, is more akin to "an employee grievance concerning internal office policy" rather than a matter of public concern. Thus, the Court concludes Plaintiff's report related to contact with former youth offenders on Facebook cannot be fairly characterized as constituting speech on a matter of public concern.

The Court also concludes Plaintiff has not established that a photograph on employee Pearce's Facebook page[12] that shows Pearce and others in a hotel room with adult women and alcohol is a matter of public concern. At deposition Plaintiff testified there was not any indication that the activities happened on State time, involved the use of State

---

[12] The photograph might have been on the Facebook page of Mike Beebe, another OYA employee. The record is unclear, but the specific location of the photograph is immaterial for purposes of First-Amendment analysis.

funds, or constituted any illegal acts.  Plaintiff reported the
photograph merely because she thought it might be "suspicious."

The Court also concludes Plaintiff's report of
Pearce's Facebook page that included a photograph taken during
"takedown training" depicting Pearce in a takedown position with
another employee is not a matter of public concern.  Plaintiff
testified at deposition that she believed the position in the
photo was "inappropriate for a subordinate - or a supervisor to
have one of his female staff in a position like that."  Abrams
Decl., Ex. A at 75.  Plaintiff does not allege or establish the
takedown position was prohibited or beyond the scope of the
training exercises.  Thus, Plaintiff's discomfort with the
position of Pearce and a subordinate during training on takedowns
cannot be fairly characterized as constituting speech on a matter
of public concern.

The Court also concludes Plaintiff's May 19, 2010,
report related to an alleged breach of confidentiality by Wahl
relating to Ramsay is not a matter of public concern.  Although
the facts of this report are somewhat unclear, it appears
Plaintiff was talking with Lori Ramsay, who mentioned she had
been talking with OYA Investigator Wahl.  Wahl reportedly told
Lori Ramsay that her husband (another OYA employee) was going to
be questioned about a complaint involving him.  Plaintiff
believed from her conversation with Lori Ramsay that Wahl had

39 - REDACTED OPINION AND ORDER

violated OYA confidentiality rules when he told Lori Ramsay about
a pending investigation.  OYA later found Wahl was not the
investigator, and Ramsey advised OYA that the investigator had
not shared any information with her.  In any event, Plaintiff's
report involved an alleged violation of OYA internal policies,
which is the kind of nonpublic complaint that the *Desrochers*
court concluded was not a matter of public concern.

> **2.  Substantial motivating factor/Defendants
> would have taken the same action regardless
> of Plaintiff's speech**

        Even if the Court concluded any of the matters on
which Plaintiff spoke were matters of public concern, Defendants
have provided overwhelming evidence that Plaintiff's speech was
not a substantial motivating factor in their decision to
terminate her and that Defendants would have terminated Plaintiff
regardless of her speech.  The record is replete with Plaintiff's
poor performance evaluations beginning in 2003 and numerous
disciplinary letters and written reprimands beginning in 2005
written by individuals who Plaintiff does not allege had any
First-Amendment discriminatory motive.  The record also reflects
a number of investigations by Human Resources in which Defendants
concluded Plaintiff violated OYA policies by doing things such as
posting a photograph on Facebook that included confidential OYA
documents.  Thus, the record reflects Plaintiff had a history of
underperforming and received numerous reprimands that predated

40 - REDACTED OPINION AND ORDER

any of the reports on which she relies for her First-Amendment claim.

Even viewing the evidence in the light most favorable to Plaintiff, the Court concludes she has not established a genuine dispute of material fact exists as to whether Defendants would have terminated her if she had not made the reports that form the basis of her claim against Jeske and Pakseresht.

>    **3.    Plaintiff spoke as a public employee rather than as a private citizen**

Defendants also contend Plaintiff has not established that she spoke as a private citizen rather than as a public employee when she made the reports at issue, and, therefore, Plaintiff's speech was not protected under the First Amendment.

As noted, to maintain a First-Amendment claim, a plaintiff must establish, among other things, that she spoke as a private citizen rather than as a public employee. *Eng*, 552 F.3d at 1070. Plaintiff bears the burden to make this showing. *Id*. Whether a plaintiff spoke as a private citizen involves a mixed question of law and fact. *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008). The scope and content of a plaintiff's job responsibilities is a question of fact. If a plaintiff fails to establish a material dispute of fact exists as to the scope and content of her job

41 - REDACTED OPINION AND ORDER

responsibilities, the court may determine the issue on summary
judgment. *Marez v. Bassett*, 595 F.3d 1068, 1075 (9th Cir. 2010).
The "ultimate constitutional significance" of the scope and
content of a plaintiff's job responsibilities as applied to the
allegedly protected speech is a matter of law for the court.
*Eng*, 552 F.3d at 1071.  Ultimately speech is not protected if it
was made "pursuant to" a plaintiff's job responsibilities.
*Huppert*, 574 F.3d at 704.

        The inquiry into whether a public employee spoke
pursuant to her official job duties is a "practical one."
*Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006).  As the Court
noted in *Garcetti*,

> [f]ormal job descriptions often bear little
> resemblance to the duties an employee actually is
> expected to perform, and the listing of a given
> task in an employee's written job description is
> neither necessary nor sufficient to demonstrate
> that conducting the task is within the scope of
> the employee's professional duties for First
> Amendment purposes.

*Id*. at 424-25.  In light of *Garcetti*, the Ninth Circuit and other
courts have held speech that public "employers have not expressly
required may still be pursuant to official duties so long as the
speech is in furtherance of such duties."  *Weintraub v. Bd. of
Ed. of City Sch. Dist. of New York*, 593 F.3d 196, 202 (2d Cir.
2010)(citing *Freitag v. Ayers,* 468 F.3d 528, 546 (9th Cir. 2006);
*Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir.
2007); *Phillips v. City of Dawsonville*, 499 F.3d 1239, 1242 (11th

42 - REDACTED OPINION AND ORDER

Cir. 2007); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d
1192, 1204 (10th Cir. 2007)).  In addition, an employee's job
responsibilities are not limited to required or mandatory duties.
*Freitag*, 468 F.3d at 546.

Plaintiff contends her job duties did not include
reporting on any of the four things that were the subject of her
reports, and, therefore, she spoke as a private citizen on these
matters.  Plaintiff points to the PSO Support Staff Functions job
task list for her position and the OS1 Position Description
Duties to support her contention.  It is undisputed that neither
of these documents specifically requires Plaintiff to report on
the kinds of issues that form the basis for her First-Amendment
retaliation claim.

Defendants, however, point out that under the
"miscellaneous" category of Plaintiff's job description,
Plaintiff's duties included "adhering to expectations of the job
as outlined in agency mission, principles of conduct, code of
ethics, professional standards and performance expectations."
OYA policy 0-2.0 Principles of Conduct provides in pertinent
part:

> OYA expects every staff member to adhere to and
> demonstrate these values and the standards
> expressed in the following Principles of Conduct:
>
> * * *
>
> Report illegal and unethical on-and off-duty staff
> behavior and ensure that a code of silence is

never a part of OYA culture.

Decl. of Marc Abrams, Ex. J at 2.  With respect to the dodgeball incident, OYA policy 0-2.3 requires staff to report all suspected abuse of youth offenders and OYA policy II-1.1 requires staff to report inappropriate "physical intervention."  Both of those policies required Plaintiff to report what she believed to be abusive throwing of dodgeballs at youth.

Plaintiff testified she reported the Facebook photograph taken during a takedown training exercise because she felt it depicted inappropriate physical contact and conduct.  OYA policy 0-3.0 prohibits harassing behavior in the workplace and requires employees who suspect sexual harassment to inform management.

As to Plaintiff's report of Facebook contact by OYA staff with former youth offenders, OYA policy 0-2.2 prohibits social-media networking between OYA employees and former youth offenders and requires staff to report violations of the policy.

Finally, as to Plaintiff's report of OYA Investigator Wahl's suspected breach of confidentiality, OYA policy 0-2.1 prohibits employees from disclosing OYA records or information unless it is related to work assignments.  That policy also requires staff to report violations of the policy.

The Court concludes on this record that Plaintiff has not established that her job duties and responsibilities

44 - REDACTED OPINION AND ORDER

included the requirement to make the reports she relies on to support her First-Amendment claim. Moreover, the Court concludes Plaintiff's reports were made pursuant to her job duties as a public employee rather that as a private citizen, and, therefore, these reports do not support a claim for violation of her rights under the First Amendment.

Accordingly, the Court grants Defendants' Motion as to Plaintiff's First-Amendment claim.

## III. Procedural Due Process

In her Complaint Plaintiff alleges she had a protected interest in her job at OYA and that Pakseresht and Jeske

> violated Plaintiff's procedural due process, as guaranteed by the Fifth Amendment to the Constitution of the United States of America and extended to the States by the Fourteenth Amendment, by terminating Plaintiff's employment without providing prior notice of the charges against her, without providing prior notice of the sanctions being considered, and without providing Plaintiff an opportunity to refute the charges. Defendants did not provide Plaintiff with a fair opportunity to be heard prior to terminating her employment.

Compl. at ¶ 143.

At oral argument Plaintiff asserted she was entitled to some additional unidentified process due to her disabilities. Plaintiff also asserted she was entitled to have Pakseresht at her predismissal hearing.

### A. Standard

45 - REDACTED OPINION AND ORDER

The process due an individual before termination of protected employment is a question of law for the court. *Belnap v. Chang*, 707 F.2d 1100, 1102 (9th Cir. 1983)(whether due process has been afforded is a question of law).  The Supreme Court has made clear that a public employee threatened with termination is entitled to a very limited pre-termination hearing as "an initial check against mistaken decisions." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-46 (1985).  A hearing that includes oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story satisfies due process. *Loudermill*, 470 U.S. at 545-46.  *See also Gilbert v. Homar*, 520 U.S. 924, 929 (1997)("[A] public employee dismissable only for cause [is] entitled to a very limited hearing prior to his termination.");  *Miller v. Clark County Sch. Dist.*, 378 F. App'x 623, 625 (9th Cir. 2010)(The plaintiff "received the due process to which he was entitled under federal law, as he received pre-termination notice of the reasons for the discipline, an explanation of the District's evidence, and notice of the means through which he could present his side of the story to a final decision maker.").

The Due Process Clause does not guarantee a "correct" decision.  The Supreme Court has noted the "Due Process Clause . . . is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood,* 426 U.S. 341, 350, (1976).

*See also Engquist v. Or. Dept. of Agr.*, 553 U.S. 591, 599 (2008)
(same); *Connick v. Myers*, 461 U.S. 138, 147 (1983)("[A]bsent the
most unusual circumstances, a federal court is not the
appropriate forum in which to review the wisdom of a personnel
decision taken by a public agency allegedly in reaction to the
employee's behavior.").

**B.   Analysis**

As noted, prior to her termination Plaintiff
(1) received the July 19, 2010, pre-dismissal letter placing her
on duty station at home and thoroughly detailing her various
performance problems, disciplinary issues, violation of OYA
policies, and possible sanctions to follow; (2) was advised she
could respond in writing to the letter; (3) responded to the
July 19, 2010, letter; (4) participated in the July 28, 2010,
predismissal meeting with Jeske and Chartier and was represented
by a SEIU representative; (5) received the August 23, 2010,
predismissal letter setting out Plaintiff's performance problems,
disciplinary issues, violations of OYA policies, and possible
sanctions to follow and providing Plaintiff with a chance to
respond to the letter; and (6) participated in the August 31,
2010, predismissal meeting with Jeske, Haverty, and Smith and was
represented by SEIU representatives.  The record reflects
Plaintiff had numerous other notices of OYA's problems with
Plaintiff's performance as well as the evidence supporting those

47 - REDACTED OPINION AND ORDER

problems, at least two opportunities to respond to OYA's issues in writing (which Plaintiff took), and at least two predismissal hearings at which Plaintiff and the SEIU representatives were heard. The Court concludes as a matter of law that Defendants' procedures more than satisfied the minimal requirements set out by the Supreme Court.

In her Response and in her Supplemental Memorandum Plaintiff contends the process provided was not sufficient because her opportunities to be heard were not "meaningful" due to the fact that Jeske had "already made up his mind about [Plaintiff]." The Ninth Circuit rejected a similar argument in *Moore v. King County Fire Protection Dist. No. 26*:

> We reject [the plaintiff's 42 U.S.C. § 1983 claim that the defendants violated his constitutional right to procedural due process by utilizing an allegedly biased decisionmaker and failing to produce all of the evidence considered against him at his pre-termination hearing. The defendants provided [the plaintiff] with notice and a hearing, in compliance with the minimum requirements of *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538-46 (1985).

327 F. App'x 5, 1 (9th Cir. 2009). In addition, even if Plaintiff had established Jeske was biased against her and that his bias rose to the level of a due-process violation, Plaintiff has not pointed to any evidence that establishes the numerous other individuals involved in evaluating Plaintiff's performance, addressing the various issues raised by Plaintiff's actions, and recommending Plaintiff's termination were biased against her.

48 - REDACTED OPINION AND ORDER

For example, Plaintiff does not allege Chartier or Haverty (who investigated and drafted the predismissal letters and attended the predismissal meetings) or Smith (who conducted the July and August predismissal meetings) had any bias against Plaintiff even though each of these individuals provided advice and investigation findings to Pakseresht before he issued Plaintiff's termination letter.

As to Plaintiff's assertion at oral argument that she was entitled to some further, unspecified process due to her mental-health issues, the Court questions whether Plaintiff is conflating a claim under the ADA with one for procedural due process.  In any event, Plaintiff does not point to any evidence in the record that she requested a continuance or any other accommodation for her mental-health issues.  Plaintiff also does not specify any accommodation that she would have requested that she did not receive to assist her in the process.

On this record the Court concludes Plaintiff has not established any genuine dispute of material fact exists as to whether she was afforded sufficient process before her termination.  Accordingly, the Court grants Defendants' Motion as to Plaintiff's claim for violation of her right to procedural due process.

**IV.  Reconsideration of the Court's dismissal of Plaintiff's Tenth Claim for wrongful discharge**

In her Supplemental Memorandum Plaintiff asks the Court to reconsider its October 11, 2012, Order dismissing without prejudice Plaintiff's Tenth Claim for wrongful discharge. Plaintiff asserts FMLA does not provide an adequate remedy, and, therefore, the Court should not dismiss Plaintiff's Tenth Claim.

The Court notes Plaintiff in her Response to Defendants' Motion conceded the Eleventh Amendment barred "Plaintiff from bringing her . . . Tenth Claim[] . . . to this court for adjudication" pursuant to *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 99 (1994).  The Court agreed and dismissed Plaintiff's Tenth Claim without prejudice.

Nevertheless, the Court has, in fact, reconsidered its Order.  The Court, however, adheres to its October 11, 2012, Order dismissing Plaintiff's Tenth Claim on the ground that Plaintiff is barred by sovereign immunity from bringing a state-law wrongful-discharge claim against the State of Oregon in this Court.

<u>CONCLUSION</u>

For these reasons, the Court **DENIES** Plaintiff's Motion (#80) for Leave to File Reply**.**  The Court **GRANTS** Defendants' Motion (#21) to Dismiss and/or for Summary Judgment as to Plaintiff's

50 - REDACTED OPINION AND ORDER

remaining claims for violations of FMLA, substantive due process,

and procedural due process and **DISMISSES** those claims **with**

**prejudice.**

IT IS SO ORDERED.

DATED this 30th day of January, 2013.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

51 - REDACTED OPINION AND ORDER